**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
UNITED STATES,

                Plaintiff,

        -against-                 **MEMORANDUM OF DECISION AND ORDER**
                                                 10-CR-00622 (ADS)(WDW)

STEPHANIE LLOYD,

                Defendant.
----------------------------------------------------------X

**APPEARANCES:**

**Loretta Lynch**
United States Attorney
610 Federal Plaza
Central Islip, NY 11722
      By:   Lara Treinis Gatz
             Thomas M. Sullivan
             Assistant United States Attorneys

**LaRusso & Conway LLP**
*Attorneys for the Defendant*
300 Old Country Rd
Suite 341
Mineola, NY 11501
      By:  Robert P. LaRusso, Esq., Of Counsel

**Spiro L. Ferris, Attorney at Law**
*Attorneys for the Defendant*
225 Broadway
Suite 3504
New York, NY 10279
      By:  Spiro L. Ferris, Esq., of Counsel

**SPATT, District Judge**.

On May 18, 2012, defendant Stephanie Lloyd ("Lloyd") was convicted of conspiracy to commit robbery, robbery, and brandishing of a firearm during a crime of violence.

Presently before the Court are motions by Lloyd for a judgment of acquittal pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure ("Fed. R. Crim. P.) and for a new trial pursuant to Fed R. Crim. P. 33.  The Government opposes the motions.

## I.  BACKGROUND

### A.  <u>The Indictment</u>

On December 9, 2010, Lloyd, along with Sharod Williams (also known as "Sharod Brown") and Travis Walker, were indicted and charged with Hobbs Act conspiracy to commit robbery, conspiracy to commit robbery, robbery, and brandishing of a firearm during a crime of violence in connection with an armed robbery.  The robbery occurred at the Wyandanch Post Office (the "Post Office") on October 30, 2009.  There were several superseding indictments in this case against Lloyd, Williams, Walker, and other co-conspirators.  Relevant here, on May 1, 2012, pursuant to a superseding indictment, Lloyd was charged with (1) conspiracy to commit robbery of the Post Office pursuant to 18 U.S.C § 371 and 3551 *et seq*; (2) robbery of the Post Office pursuant to 18 U.S.C. §§ 2114(a)(2) and 3551 *et seq.*; and (3) brandishing of a firearm during a crime of violence in furtherance of Counts one and two pursuant to 18 U.S.C. §§ 924(c)(1)(A)(ii), 924(c)(1)(C)(ii) and 3551 *et seq*.

### B.  <u>The Trial Testimony</u>

The Court conducted separate criminal proceedings for the various conspirators, some of whom pleaded guilty to certain counts of the numerous indictments and some of whom were found guilty after trial to certain counts of the indictments.  On May 8, 2012, the trial against Lloyd commenced.  The jurors heard testimony from, among others, Lloyd, Walker, and a postal inspector.  Although this Court will not review all the testimony, the Court will discuss the testimony relevant to Lloyd's post-trial motions.

The evidence adduced at the trial established that Lloyd worked at the Wyandanch Post Office but was not present at the time of the robbery. Lloyd and Walker knew each other from high school and maintained an "on and off" romantic relationship from 2002 through 2009 (Tr. 625, 630, 732–33.) In 2006, a separate armed robbery occurred at the Post Office while Lloyd was there. After the incident, Lloyd did not return to work for some time, and, according to Walker, she collected worker's compensation benefits by falsely pretending that she had been "traumatized and scared" as a result of the robbery. (Tr. 626-27, 778.)

In Spring 2009, Lloyd indicated to Walker in a telephone conversation that she wanted the post office to be robbed because "she wanted to be there so she can get the workers compensation" (Tr. 638–639.) Walker stated that Lloyd explained that "there is not enough money in the post office for somebody to rob," but that, during the Christmas holidays, "[t]here is more money . . . [a]round $25 to $30,000." (Tr. 636.) Walker testified that he placed the telephone on speaker and asked Lloyd to repeat herself so that Walker's cousin, Williams, could hear. Lloyd then repeated over the speaker phone that "there's $25,000 to $30,000 in the post office around the holidays" and that she wanted to be present for the robbery to enable her to collect worker's compensation. (Tr. 637-639, 739.) Walker subsequently told Lloyd that "[he] had people that could do the robbery." (Tr. 640.)

Over the next few months, Walker spoke with Lloyd, both in person and over the telephone, "about robbing her post office while she was there." (Tr. 640, 643.) During these discussions, Walker stated that Lloyd told him (1) she and another male employee would open the Post Office at 5 o'clock in the morning; (2) that they would have the combination to the safe and code to the alarm; (3) that the robbers would have "until 5:30 . . . before the truck comes to drop off and deliver mail; and (4) the robbers "had to keep the second door open, because if it

3

close[d] on them they w[ould] be locked inside the post office." (Tr. 640–42, 661.) According to a postal inspector who interviewed Lloyd after the robbery, Lloyd summarized her conversations with Walker about the Post Office by stating "any question that [Walker] may have asked [me] about the Post Office . . . [she] would have answered him." (Tr. 917.)

Walker discussed with Lloyd the "entire plan" to rob the post office as follows: Walker, Williams, and others "at armed gunpoint," would force Lloyd and the other employee into the Post Office, have them deactivate the alarm, open the safe and "take their personal belongings and leave." (Tr. 644-45; 662.) In agreeing to the plan, Lloyd demanded that she be present at the Post Office at the time of the robbery. According to Walker, Lloyd insisted that they "make sure the robbery took place while she was there. That was the most important thing . . [ b]ecause she wanted to get her worker's comp." (Tr. 646) Walker stated that the plan called for the robbery to occur "around Christmas[ ]time . . . when the most money would be there" and that the plan was never "for the post office to be robbed in October." (Tr. 647, 722-23.)

On the date of the robbery, Lloyd was not present at the Post Office. After the robbery occurred, Walker spoke with Lloyd who "was pissed. She was mad that she wasn't there. She wasn't able to benefit for it, from the robbery. She didn't get nothing out of it, no worker's comp." (Tr. 673.) According to Walker, Lloyd "didn't know of the robbery being done early . . . [that they didn't tell] . . . that they were going to do it at that point in time" (Tr. 758-59.)

## C. The Verdict

On May 18, 2012, the jury returned a verdict finding Lloyd guilty on all three counts of the indictment. On July 27, 2012, defendant moved for a judgment of acquittal pursuant to Fed. R. Crim. P 29 (c) and for a new trial pursuant to Fed R. Crim P. 33.

4

## II. DISCUSSION

### A. Legal Standards

### 1. The Legal Standard Under Rule 29

The standard on a motion for a judgment of acquittal is well-settled. In the Second Circuit, it has been repeatedly stated that a defendant challenging a conviction on the basis of insufficient evidence bears a heavy burden. See United States v. Thomas, 377 F. 3d 232, 237 (2d Cir. 2004); United States v. Tocco, 135 F. 3d 116, 123 (2d Cir. 1998); United States v. Russo, 74 F. 3d 1383, 1395 (2d Cir. 1996). This is because the evidence must be viewed in the light most favorable to the government and all permissible inferences must be drawn in its favor. See United States v. Irving, 452 F. 3d 110, 117 (2d Cir. 2006); United States v. Jones, 393 F. 3d 107, 111 (2d Cir. 2004); United States v. Hernandez, 85 F. 3d 1023, 1030 (2d Cir. 1996); see also United States v. Casamento, 887 F. 2d 1141, 1156 (2d Cir. 1989). The Court also must defer to the jury's resolution of witness credibility and, where there is conflicting testimony, to its selection between competing inferences. Tocco, 135 F.3d at 123; see also United States v. Pelaes, 790 F. 2d 254, 259 (2d Cir. 1986).

A conviction must be sustained if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); United States v. Desimone, 119 F. 3d 217, 223 (2d Cir. 1997). Further, the elements of the crimes charged may be established entirely by circumstantial evidence. See United States v. Sureff, 15 F.3d 225, 228 (2d Cir. 1994). Also, the Court must consider the evidence in its totality, and not in isolation. See United States v. Rosenthal, 9 F.3d 1016, 1024 (2d Cir. 1993).

"If the court concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000). With these principles in mind, the Court must uphold the jury's verdict if it finds that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560.

## 2. The Legal Standard Under Rule 33

Rule 33 is very brief and states that upon the defendant's motion "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. This rule by its terms gives the trial court "broad discretion to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." United States v. Sanchez, 969 F. 2d 1409, 1413 (2d Cir. 1992); see also United States v. Robinson, 430 F. 3d 537, 543 (2d Cir. 2005). In deciding such a motion, the Court may weigh the evidence and the credibility of witnesses, but cannot "wholly usurp" the role of the jury. United States v. Autuori, 212 F. 3d 105, 120 (2d Cir. 2000); United States v. Guadagna, 183 F. 3d 122, 129 (2d Cir. 1999).

This standard has also been described as a "heavy burden," United States v. Fearon-Hales, No 04-231, 2005 WL 2385845 at *1, 2005 U.S. Dist. LEXIS 21619, *3 (S.D.N.Y. Sept. 26, 2005), and "[i]t is well-settled that motions for new trials are not favored and should be granted only with great caution." United States v. Costello, 255 F. 2d 876, 879 (2d Cir. 1958). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." United States v. Ferguson, 246 F. 3d 129, 134 (2d Cir. 2001).

B. **As to Lloyd's Rule 29 Motion**

Lloyd argues that the government failed to prove that she committed an overt act in furtherance of the "October" robbery charged in Count I in that she did not act with the requisite specific intent to commit the robbery on that date. Lloyd concedes that sufficient evidence may have existed for the jury to find that the charged overt act occurred, but argues that the overt act occurred in furtherance of a different conspiracy, namely, the "Christmas time" robbery. For this same reason, Lloyd contends, she may not be held criminally responsible under Counts II and III – robbery of the Post Office and brandishing a firearm in furtherance of the robbery, respectively. The Court finds that this argument lacks merit.

Whether the government has proved a single conspiracy or "multiple other independent conspiracies is a question of fact for a properly instructed jury." United States v. Alessi, 638 F. 2d 466, 472 (2d Cir. 1980) (citations omitted). To prove a single conspiracy, "the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal." United States v. Maldonado-Rivera, 922 F. 2d 934, 963 (2d Cir. 1990) (quoting United States v. Martino, 664 F. 2d 860, 876 (2d Cir. 1981), cert. denied, 458 U.S. 1110, 102 S. Ct. 3493, 73 L. Ed. 2d 1373 (1982)), cert. denied, --- U.S. ----, 111 S. Ct. 2811, 115 L. Ed. 2d 984 (1991). "The co-conspirators need not have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan." United States v. McDermott, 245 F.3d 133, 137 (2d Cir. 2001) (internal quotation marks omitted). "Moreover, 'a single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance.'" United States v. Berger, 224 F. 3d 107, 114–15 (2d Cir. 2000) (quoting United States v. Maldonado-Rivera, 922 F. 2d 934, 963 (2d Cir. 1990)).

7

In this case, at the charging conference, Lloyd's counsel made the following argument:

> Lloyd's Counsel: looking at the evidence most favorably to the government, you can draw a conclusion that Ms. Lloyd conspired to rob the post office. However, there is a substantial amount of evidence that Ms. Lloyd was unaware that the post office was going to be robbed on October 30th, and that she had no knowledge that it was going to be robbed. And the conspiracy she actually joined was for her to be in the Post Office, according to Mr. Walker, at the time of the robbery so she could file a claim for compensation. We know from the testimony of Mr. Walker . . . that Ms. Lloyd was not in the post office; that she was not aware that it was being robbed, and therefore, was not a participant. And I think, based on the facts of this case, the jurors could find a separate conspiracy that Mr. Sharod Williams initiated to cut Ms. Lloyd out and to utilize the information for his own purpose without her knowledge and participation. I'm going to request that the court give the standard instruction on multiple conspiracy.
>
> The Court: I don't think there is any evidence of a multiple conspiracy. There is one conspiracy to allegedly help them rob the Post Office. The fact that it was done on a day she was not there is another matter. And it doesn't make it a different conspiracy. It is one conspiracy here, very simple. So your motion is denied. And you have an exception.

(Gov Opp at 5).

The Court identifies no error in this ruling. The evidence suggested that there was "mutual dependence and assistance" between Lloyd and her co-conspirators – indeed, Lloyd informed the Walker about the workers and layout of the Post Office. As the government aptly states, "that Lloyd was not present when the robbery was committed, preventing her from faking a worker's compensation claim, is of no moment because the crew didn't form another conspiracy to rob the Post Office, they just decided to rob the Post Office on a [different] day, regardless if she [was] working" (Gov Opp at 4). Furthermore, that Lloyd was not present when the robbery was committed, and would thus be unable to secure workers' compensation benefits, did not alter the "common goal" of the conspiracy, namely to rob the Post Office.

8

In addition, the jury rationally held Lloyd criminally responsible for Counts II and III based on Pinkerton v. United States, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946). Under Pinkerton, "[o]nce a conspiracy has been established, the criminal liability of its members extends to all acts of wrongdoing occurring during the course of and in furtherance of the conspiracy." United States v. Gallerani, 68 F. 3d 611, 620 (2d Cir. 1995) (internal quotation marks omitted). Pinkerton is not "a broad principle of vicarious liability that imposes criminal responsibility upon every co-conspirator for whatever substantive offenses any of their confederates commit." United States v. Bruno, 383 F.3d 65, 90 (2d Cir. 2004) (quotation marks omitted). Instead, Pinkerton provides that "a defendant who does not directly commit a substantive offense may nevertheless be liable if the commission of the offense by a co-conspirator in furtherance of the conspiracy was reasonably foreseeable to the defendant as a consequence of their criminal agreement." United States v. Parkes, 497 F. 3d 220, 232 (2d Cir. 2007) (quotation marks omitted). Applying Pinkerton here, in the Court's view, it was "reasonably foreseeable" to Lloyd that the conspirators would commit armed robbery. Accordingly, Lloyd's Rule 29 (c) motion is denied.

## C. As to Lloyd's Rule 33 Motion

In support of her Rule 33 motion for a new trial, Lloyd argues that (1) Walker's testimony was so patently incredible that no rational juror could believe it; (2) the government presented Walker's testimony in a misleading way; (3) the Court erred in its charge concerning the evaluation of Walker's credibility; and (4) the Court erred in charging the jury on the Pinkerton theory of liability. The Court will address each of these arguments in turn.

1. **Walker's credibility**

Lloyd argues that she is entitled to a new trial because "the entire case rests on the incredible testimony of a single witness, Travis Walker." (Def's Ltr at 16). This argument ignores the highly culpable nature of Lloyd's interview with a postal inspector and its corroboration by Walker. LLoyd admitted to the postal inspector, and Walker corroborated, that she told him about the workers and security at the Post Office. (Tr. 914-16.)

While under Rule 33, the Court may weigh the evidence and the credibility of witnesses in its present assessment, it cannot "wholly usurp" the role of the jury. Autuori, 212 F.3d at 120. Moreover, that some of Lloyd's tips about how to conduct the robbery – namely, about how the second door locked and the amount of money in a certain safe – may have been inaccurate does not negate Lloyd's criminal responsibility, but rather merely speaks to her "effectiveness" as a co-conspirator. Accordingly, the Court finds that Walker's testimony was not so incredible that a new trial is warranted.

2. **The Government's Purported Misleading Presentation of Walker's Testimony**

Lloyd also asserts that the government structured Walker's testimony in such a way as to mislead the jury. Specifically, Lloyd claims that the government withheld a cooperation agreement with Walker. However, Lloyd's counsel acknowledged at trial that he was "not saying there was an agreement" between Walker and the government. (Tr. 1181.)

Similarly, Walker testified that (1) "[n]o promises" were made "in return for [his] appearing" in court; (2) "it's only a hope that [he has] that someone will come to [him] and rescue [him] and remove that mandatory minimum of . . . 82 years;" and (3) "in order for that truth to happen, [he had] to come in here and tell the truth" (Tr. 689.) The government also elicited testimony from Walker that "the Government [did not] promise [him] anything to cause

[his] testimony today . . . they [did not] promise to give [him] leniency . . . [did not] promise to ask the judge to give him leniency." (Tr. 687.) Under these circumstances, the Court finds that the Government did not present Walker's testimony in a misleading manner.

### 3. The Jury Charge as Related to Walker's Testimony

Lloyd argues that the Court should have charged the jury to evaluate Walker's testimony as a cooperative witness. However, as noted above, Lloyd was not a cooperating witness, and therefore the Court properly did not charge the jury as such. The Court previously denied Lloyd's request for this charge stating "I will not let the jury guess what is going to happen afterward. We don't play guessing games. He has no cooperation agreement. He can tell the government I don't want to testify. Maybe he will try to get a break afterward, and maybe he won't get that break. I don't know." (Tr. 1182.)

In any event, the Court did qualify its instruction stating, "that [Walker] a witness who is hoping to receive a lighter sentence by giving testimony favorable to the prosecution [and] may have a motive to testify favorably to the Government. Therefore, you must scrutinize his testimony with some caution." (Tr. 1360.) The Court described this charge as a "great benefit" and "real break" for Lloyd because she effectively received the benefit of a charge she was "not entitled" to get. (Tr. 1180-1181.) Given the absence of a cooperation agreement between Walker and the government, the Court properly declined to charge the jury as such regarding his testimony in the manner requested.

### 4. The Pinkerton Charge

Lastly, Lloyd argues that the Court's jury instruction "failed to properly present all the necessary elements on the Pinkerton theory of criminal liability requiring reversal of Counts Two and Three." (Def's Ltr at 25.) In particular, Lloyd argues that the Court erred in failing to

11

charge the jury that the "substantive crime under consideration 'must fall within the scope of the unlawful project'" and that "in evaluating a defendant's responsibility for co-conspirator conduct, the jury should focus on the agreement as the defendant understood it." (Id. at 26., citing United States v Cirillo, 468 F.2d 1233, 1234 (2d. Cir 1972).

At trial, the Court gave the following Pinkerton charge:

> Now I will instruct you as to Counts 2 and 3, an additional instruction, which is called the Pinkerton charge.
>
> . . .
>
> If, in light of my instructions, the Government proves beyond a reasonable doubt that the defendant, Stephanie Lloyd, was a member of the conspiracy to rob the post office, charged in Count 1 of the indictment, and thus guilty of the conspiracy, Count 1, then you may also, but you are not required to, find her guilty of the substantive crimes charged in Counts 2 and 3, provided you find the Government proved beyond a reasonable doubt each of the following five elements:
>
> First, that the crime charged in the substantive count you are considering was committed;
>
> Second, that the person or persons you find actually committed the substantive crime was or were members of the conspiracy you found to have existed in Count 1;
>
> Third, that the substantive crime you are considering was committed pursuant to a common plan and understanding you found to exist among the conspirators;
>
> Fourth, that the defendant, Stephanie Lloyd, was a member of that conspiracy at the time the substantive crime was committed; and
>
> Fifth, that the defendant, Stephanie Lloyd, could have reasonably foreseen that the substantive crime charged either in Counts 2 and 3 might be committed by her coconspirators.
>
> . . .
>
> So that if the Government has proven all five of these elements beyond a reasonable doubt, then you may find the defendant,

> Stephanie Lloyd, guilty of the substantive crimes charged against her in Count 2 and 3, even if the defendant did not have actual knowledge of the acts constituting the crime.
>
> The reason for this rule is simply that a coconspirator who commits a substantive crime pursuant to a conspiracy is deemed to be the agent of the other conspirators. Therefore, all of the coconspirators must bear criminal responsibility for the commission of reasonably foreseeable substantive crimes.
>
> If, however, the Government failed to prove any of these five elements, then you may not find the defendant guilty of the substantive crime charged in the count you are considering, namely Counts 2 and 3, unless the Government proves beyond a reasonable doubt that the defendant aided and abetted the commission of the substantive crime charged in count 2, the post office robbery.

(Tr. 1386-1389.) These jury instructions are almost verbatim the Pinkerton charge contained in Modern Federal Jury Instructions – Criminal § 19.03 and the Court finds no error in this respect. Moreover, the Government asserts, and Lloyd does not dispute, that she failed to voice an objection to the Pinkerton charge at the charge conference.

Lloyd's reliance on Cirillo is misplaced. Lloyd focuses on Judge Kaufman's statement: "The critical inquiry in any conspiracy case involves a determination of the 'kind of agreement or understanding (that) existed as to each defendant . . . as *he understood it.*'" Id. at 1235 (emphasis added)

Here, Lloyd contends, she did not "understand" that the robbery conspiracy was to occur in October 2009. However, the evidence indicates that neither Lloyd nor her co-conspirators settled on a fixed and firm date near the holidays to rob the Post Office. Likewise, upon closer review of Cirillo, it appears the case actually cuts against Lloyd. In Cirillo, the defendant was accused of being a conspirator relating to two transactions to deliver heroin, one in August 1971, another in September/October 1971. The defendant was not present at the time of the

September/October transaction, but there was ample evidence to establish that he was a member of the conspiracy in the August deal. The separate shipments of heroin contemplated in Cirillo involved transactions more discrete than the single conspiracy to commit the robbery here. Nonetheless, Cirillo held that a jury might reasonably have believed that the actions of the co-conspirators relating to the September/October shipment were within the scope of the agreement as Cirillo understood it, i.e., Cirillo expected future deliveries of heroin, even though he may not have been aware of the second shipment. Where, as here, the contemplated robbery involved a single transaction, the Court finds no error in the Pinkerton charge.

### III. CONCLUSION

Under these circumstances, the Court finds that letting the guilty verdict stand would not be a manifest injustice. Thus, it is hereby

**ORDERED**, that the Defendant Stephanie Lloyd's Rule 29 motion for a judgment of acquittal is DENIED; and it is further

**ORDERED**, that the Defendant Stephanie Lloyd's Rule 33 motion for a new trial is DENIED.

SO ORDERED.
Dated: Central Islip, New York
May 25, 2013

                                           *Arthur D. Spatt*
                                           ARTHUR D. SPATT
                                           United States District Judge